**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: NAPSTER, INC. COPYRIGHT
LITIGATION,

UMG RECORDING, INC.; INTERSCOPE
RECORDS; MOTOWN RECORD
COMPANY, L.P.; JERRY LEIBER;
MIKE STOLLER, individually and
dba as Mike Stoller Music; FRANK
MUSIC CORPORATION; PEER
INTERNATIONAL CORPORATION, on
behalf of themselves & all others
similarly situated; CAPITOL
RECORDS, INC.; CAROLINE RECORDS,
INC.; NOO TRYBE RECORDS, INC.;
VIRGIN RECORDS AMERICA, INC.;
NARADA PRODUCTIONS, INC.; HIGHER
OCTAVE MUSIC, INC.; PRIORITY
RECORDS LLC; FOREFRONT
COMMUNICATIONS GROUP, INC.;
JUBILEE COMMUNICATIONS, INC.;
EMI CHRISTIAN MUSIC GROUP, INC.;
BRIDGEPORT MUSIC, INC.;
SOUTHFIELD MUSIC, INC.;
WESTBOUND RECORDS, INC.,
                    *Plaintiffs-Appellees,*

                v.

No. 06-15886

D.C. Nos.
CV-00-01369-MHP
CV-04-01166-MHP
CV-04-01671-MHP
CV-04-01351-MHP
CV-04-02121-MHP

BERTELSMANN AG; BERTELSMANN, INC.; BeMUSIC, INC.,
    *Defendants-Appellants,*
    and
HUMMER WINBLAD VENTURE PARTNERS; HUMMER WINBLAD VENTURE PARTNERS IV, LP; HUMMER WINBLAD TECHNOLOGY FUND IV, LP; HUMMER WINBLAD EQUITY PARTNERS IV, LLC; HANK BARRY; JOHN HUMMER,
    *Defendants.*

In re: BERTELSMANN, INC.; In re: BeMUSIC, INC.; In re: BERTELSMANN AG,
_____

BERTELSMANN AG; BERTELSMANN, INC.; BeMUSIC, INC.,
    *Petitioners,*
    v.
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,
    *Respondent,*

No. 06-72515

D.C. Nos.
CV-00-01369-MHP
CV-04-01166-MHP
CV-04-01671-MHP
CV-04-01351-MHP
CV-04-02121-MHP

OPINION

CAPITOL RECORDS, INC.; CAROLINE
RECORDS, INC.; NOO TRYBE
RECORDS, INC.; VIRGIN RECORDS
AMERICA, INC.; NARADA
PRODUCTIONS, INC.; HIGHER OCTAVE
MUSIC, INC.; PRIORITY RECORDS
LLC; FOREFRONT COMMUNICATIONS
GROUP, INC.; JUBILEE
COMMUNICATIONS, INC.; EMI
CHRISTIAN MUSIC GROUP, INC.;
UMG RECORDINGS INC.; INTERSCOPE
RECORDS; MOTOWN RECORD
COMPANY; JERRY LEIBER,
individually and dba Jerry Leiber
Music; MIKE STOLLER, individually
and dba as Mike Stoller Music;
FRANK MUSIC CORPORATION; PEER
INTERNATIONAL CORPORATION,
               *Real Parties in Interest.*

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted
September 13, 2006—San Francisco, California

Filed March 14, 2007

Before: Ferdinand F. Fernandez, William A. Fletcher, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge William A. Fletcher

**COUNSEL**

R. Bruce Rich, Kenneth L. Steinthal, Weil Gotshal & Manges, New York, New York; Matthew D. Powers, Gayle E. Rosenstein, Weil Gotshal & Manges, Redwood Shores, California, Weil Gotshal & Manges, Austin, Texas; John W. Keker, Michael H. Page, Keker & Van Nest, San Francisco, California, for the appellants.

Daniel P. Collins, Glenn Douglas Pomerantz, Kelly M. Klaus, Munger Tolles & Olson, Los Angeles, California; Carey Ramos, Lynn B. Bayard, Paul Weiss Rifkind Wharton & Garrison, New York, New York; Peter L. Simmons, Mitchell E.

Epner, Fried Frank Harris Shriver Jacobsen, New York, New York; Paul H. Duvall, Richard Steven Busch, King & Ballow, La Jolla, California, for the appellees.

---

## OPINION

W. FLETCHER, Circuit Judge:

In this appeal, we must decide whether the district court properly ordered the disclosure of privileged attorney-client communications under the crime-fraud exception. We hold that in a civil case the district court must allow both the party seeking discovery of the communications and the party asserting the privilege to present evidence relevant to the privilege and the exception, and must weigh that evidence before ordering outright disclosure. We further hold that in a civil case, when the district court is asked to order outright disclosure, the burden of proof on the party seeking to vitiate the privilege is preponderance of the evidence. We conclude the appellees in this case have failed to make the requisite evidentiary showing to support a finding that the crime-fraud exception applies. We reverse and remand for further proceedings consistent with this opinion.

### I.   Background

This appeal arises out of litigation over alleged copyright infringement by various parties who funded Napster, the now-defunct online file-sharing service. In December 1999 and January 2000, plaintiffs Jerry Leiber et al. and Capitol Records et al., as well as other music industry players, sued Napster for copyright infringement. Leiber et al. and Capitol Records et al. (collectively "appellees") are now appellees in this court.

Appellees alleged that Napster's service enabled the unauthorized reproduction and distribution of copyrighted digital

music files. *See A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in part, rev'd in part*, 239 F.3d 1004 (9th Cir. 2001) (as amended). In July 2000, the district court entered a preliminary injunction requiring Napster to search for, and remove from its service, files that rights holders had identified as infringing. *A&M Records, Inc.*, 239 F.3d at 1011. We stayed the preliminary injunction two days later, but substantially affirmed in February 2001. *Id.* at 1029. Napster's service was shut down in July 2001 after Napster failed to comply with the terms of a modified preliminary injunction. *See A& M Records, Inc. v. Napster, Inc.,* No. C 99-05183, 2001 WL 227083 (N.D. Cal. Mar. 5, 2001), *aff'd*, 284 F.3d 1091 (9th Cir. 2002). Napster filed for bankruptcy in June 2002, and its ultimate liability for copyright infringement was never adjudicated.

Appellant Bertelsmann AG is a German media conglomerate. Between October 2000 and October 2001, Bertelsmann loaned Napster a total of about $85 million to fund its anticipated transition to a licensed digital music distribution system. However, Napster failed fully to launch the new licensed system before declaring bankruptcy. Bertelsmann did not obtain Napster's assets in the bankruptcy proceedings.

In April 2003, appellees and others separately filed suit against Bertelsmann in federal court in the Southern District of New York, claiming that Bertelsmann was vicariously and contributorily liable for copyright infringement by Napster and/or Napster's users. Appellees charged that by lending Napster millions of dollars Bertelsmann assumed control over Napster's file-sharing service, or prolonged its allegedly infringing operations, in order to avoid dispersion of Napster's estimated 40 million users before the anticipated new licensed digital music distribution system was functional. The Judicial Panel on Multidistrict Litigation subsequently transferred appellees' suits against Bertelsmann to the Northern District of California, where the *In re Napster, Inc. Copyright Litigation* was pending.

In July 2003, Bertelsmann moved to dismiss appellees' suits for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *UMG Recordings, Inc. v. Bertelsmann AG*, 222 F.R.D. 408, 410 (N.D. Cal. 2004). Bertelsmann argued as a matter of law that merely lending money to an alleged copyright infringer cannot give rise to liability under either a vicarious or contributory copyright infringement theory. *Id.* at 412. Bertelsmann further argued that its loan did not give it the ability to control Napster.

The district court denied Bertelsmann's motion to dismiss, holding that appellees had stated a claim by alleging Bertelsmann's control of Napster's operations. It explained that

> [Bertelsmann and co-defendants'] motions to dismiss are premised on the theory that plaintiffs have accused them only of what might be considered "aiding and abetting" Napster's copyright violations, viz., providing Napster with additional funding that allowed it to continue operating. According to defendants, plaintiffs thus state claims for what this court has termed "tertiary infringement" — vicarious or contributory assistance to a vicarious or contributory infringer, here Napster — and towards which this court has previously expressed disfavor. . . . Defendants have not properly characterized plaintiffs' complaints. Rather than alleging that defendants merely supplied Napster with necessary funding (serving as a "but for" cause of Napster's subsequent activities) . . . plaintiffs have specifically accused defendants of assuming control over Napster's operations and directing the infringing activities that gave rise to the original Napster litigation. . . . Capitol Records' complaint alleges essentially identical facts [as other plaintiffs']: "At least as early as September 2000, Bertelsmann began preparing to operate the Napster system, and by at least as early as October 2000, the Napster system was firmly under

> the control of Bertelsmann. Bertelsmann continued to operate the Napster system and to allow its users to copy millions of protected recordings . . . ."

*Id.* at 412-13 (internal citations omitted). The district court declined to "pass upon the question of whether mere financial support of a contributing and vicarious infringer . . . without more direct involvement" could give rise to liability. *Id.* at 414.

Pretrial discovery continued after the district court denied Bertelsmann's motion to dismiss. On November 8, 2005, appellees moved to compel Bertelsmann to produce all attorney-client communications related to a $50 million loan, convertible to equity, that Bertelsmann made to Napster on October 30, 2000 while Napster was appealing the initial preliminary injunction. Appellees contended that beginning in September 2000, when drafting of the loan documents began, Bertelsmann had engaged in a continuing scheme to defraud the courts. They argued that the crime-fraud exception to the attorney-client privilege applied to these communications, relying on two theories of fraud under California Civil Code §§ 1709-10 ("Fraudulent Deceit") (2006).

First, appellees contended that Bertelsmann's loan to Napster was not in fact a loan, but was, rather, cash tendered in exchange for an equity stake in the company. According to appellees, Bertelsmann used its lawyers to create sham loan documents that were designed to disguise what was, in fact, a purchase of control of Napster. Appellees alleged that Bertelsmann, anticipating future copyright infringement litigation, intended to use the sham loan documents to deceive the courts into concluding that it was not an equity owner and therefore was not liable for the actions of Napster.

In support of this "sham loan" theory of fraud, appellees pointed to several pieces of circumstantial evidence. They cited internal Bertelsmann documents showing that the com-

pany's executives and outside counsel sought to structure the transaction in such a way as to avoid copyright liability. In one email, counsel for Bertelsmann stated that the "loan has to look like a loan, otherwise it will be characterized as equity and [Bertelsmann] may have liability for copyright infringement in the minds of some lawyers." Appellees also pointed to the fact that, by its express terms, the $50 million loan was convertible to equity in Napster in lieu of repayment once the licensed digital music distribution system was ultimately launched. Finally, appellees showed that Bertelsmann used the loan documents in litigation on three occasions to prove it did not control Napster. First, Bertelsmann relied on the loan documents to claim secured creditor status in the Napster bankruptcy proceeding. Second, Bertelsmann cited the loan documents in its July 2003 motion to dismiss to demonstrate that it merely invested in the development of the new licensed digital music distribution system, and did not control Napster's existing operations. Third, Bertelsmann used the loan documents in a 2005 discovery dispute to show that its interests were not adverse to those of its subsidiary BMG, which was suing Napster at the time the loan was made.

Under their second fraud theory, appellees contended that Bertelsmann, through its lawyers, attempted to defraud the courts by omitting from the loan documents a side agreement that allowed Napster to channel some of the $50 million into Napster's litigation expenses. Appellees argued that Bertelsmann would benefit if continuing litigation allowed Napster's existing service to stay operational until the anticipated new system was in place, thereby avoiding dispersion of the customer base. Appellees contended that Bertelsmann believed that lending funds to Napster for use as litigation expenses might expose Bertelsmann to vicarious and contributory copyright infringement liability. Thus, according to appellees, Bertelsmann doctored the loan documents to hide the side agreement from the courts.

Appellees pointed to three pieces of direct evidence supporting this second theory of fraud. First, they pointed to an October 25, 2000 email sent by Napster CEO Hank Barry to Napster's counsel at the law firms of Boies, Schiller & Flexner LLP and Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini"). In the email, Barry described an October 24 meeting at which he and Napster director John Hummer discussed the terms of the $50 million loan with four Bertelsmann representatives: Thomas Middelhoff, Bertelsmann's CEO; Andreas Schmidt, head of Bertelsmann's eCommerce Group; Oliver Schusser, Schmidt's assistant; and Aydin Caginalp, Bertelsmann's outside counsel. Barry's email stated that two "[s]ide deals . . . will not be in the papers. These are the subjects of handshakes between Thomas and me, witnessed yesterday by Hummer, Andreas, Aydin Caginalp and Andreas' assistant Oliver." According to Barry's email, one of the side deals allowed Napster to use loan proceeds for litigation expenses: "[T]he papers will say that the $50M is to be used for development and overhead and g and a [general and administrative expenses] related to that. We have an agreement that up to $10M may be used for litigation expenses."[1]

Second, appellees pointed to a memorandum written on October 27, 2000 by Carol Timm, a Wilson Sonsini associate, in which Timm described a phone conversation in which she and Barry had "discussed the terms of the use of the [loan] proceeds." According to the memorandum, Barry told Timm the Memorandum of Terms of the loan would provide that " '[t]he loan proceeds will be used to fund the development of the business model outlined above as well as general, administrative and overhead expenses associated with such development.' " Further, Barry "informed" Timm that "[a]lthough not expressed in the Memorandum of Terms or the transaction documents, . . . the parties had verbally agreed that Napster could use up to 20% of the proceeds [*i.e.*, $10 million] toward litigation expenses." According to Barry,

---

[1] The other side agreement is not at issue in this appeal.

"[t]his agreement and the handshake" was between Andreas Schmidt and him, and was witnessed by John Hummer, Aydin Caginalp, and Oliver Schusser.

Third, appellees pointed to Barry's September 28, 2005 deposition testimony in which he described the October 24, 2000 meeting:

> [T]he discussion at the Morgan Hotel went on for a long time. There came a time in the discussion when I said that I consider overhead and GNA [general and administrative expenses] to include litigation expenses.
>
> Mr. Schmidt said, it's my recollection, Mr. Schmidt said, "Well, let's have it in a side letter."
>
> Aydin Caginalp said, "No, we're not having any side letters. The agreement is what it is."
>
> And I said, "Okay. I just want everyone to understand that, that I believe that GNA and overhead includes litigation expenses." And literally, that was the, that was the entire conversation. It went on for two minutes.
>
> At the end of the meeting, I said to Mr. Middelhoff, "I will endeavor to keep the litigation expenses under $10 million. I just want you to know that." And that was maybe, that was a period of time after we had had the discussion about whether GNA and overhead included litigations [sic] expenses.
>
> Q.  Did anyone at that meeting express the view to you that your understanding regarding litigation expenses was inconsistent with their understanding?
>
> A.  No.

In addition to these three pieces of direct evidence, appellees relied on the circumstantial evidence that Bertelsmann changed the loan terms between September 7, 2000, when an initial Memorandum of Terms was drafted, and October 30, 2000, when the final loan documents were signed. The September 7 memorandum stated that "[t]he loan proceeds will be used for general working capital purposes, primarily to fund the development of the subscription service as outlined above. . . . Up to $5M of the proceeds may be used for litigation expenses, but none for settlement purposes." An amended October 25 version provided that "[t]he loan proceeds will be used to fund the development of the service as outlined above as well as general, administrative and overhead associated with such development." The final version — a Secured Promissory Note, dated October 30 — stated that "[t]he proceeds of this Note shall be used solely to fund the development of a new model for Company's service as outlined in the Umbrella Agreement and overhead costs associated with such development."

Appellees also pointed to what they contended were lax auditing procedures required by the loan documents. They showed through deposition testimony that Napster had in fact used a portion of the $50 million loan proceeds for litigation expenses, and that, when it learned of this use, Bertelsmann failed to take any action to prevent it. Finally, appellees again pointed to Bertelsmann's use of the loan documents in the bankruptcy proceeding and in the present litigation.

In its opposition, Bertelsmann argued that evidence that it structured a corporate transaction to limit its liability did not prove either that the loan documents were a sham or that they were intended to defraud the courts. Bertelsmann further contended that no secret side agreement about litigation expenses existed. It pointed to depositions of meeting attendees Aydin Caginalp, Thomas Middelhoff, Oliver Schusser, and John Hummer. All four attendees stated that they did not recall participating in a handshake agreement, though Hummer testified

that Barry told him several days after the meeting that he understood Napster could use some of the loan proceeds for litigation expenses. Bertelsmann also pointed to a file memorandum prepared on October 25, 2000 by Caginalp that referred to one side deal referenced in Barry's October 25, 2000 email but that did not mention litigation expenses. Caginalp wrote that Barry did not want this side deal spelled out in the agreement because "[h]e wanted to avoid adverse publicity at the time the new service is announced."

Bertelsmann also pointed to statements of Bertelsmann executives Siegfried Luther, Erik Peper, and Michael Dornemann, who did not attend the meeting, but testified in their depositions that they did not learn of any side agreement about litigation expenses afterward. In addition, Bertelsmann cited the deposition testimony of Steven Bochner, a partner at Wilson Sonsini who was Napster's lead counsel on the deal and Timm's supervisor, in which Bochner denied any awareness of a side agreement. Bertelsmann argued, further, that in his deposition Barry backed away from his earlier email account of a handshake agreement about litigation expenses.

Bertelsmann contended that changes in the language of the loan documents resulted from the course of negotiations, as each party tried to obtain terms favorable to its respective interests. Bertelsmann pointed to Timm's deposition, in which she testified that Napster was "trying to find language that would give [it] some flexibility or wiggle room, in terms of its ultimate use of the loan proceeds." Bertelsmann argued that its own executives were attempting to negotiate the loan "to accommodate" the concerns of its subsidiary BMG, which was suing Napster, and to "stay true to Bertelsmann's core purpose in making the loan," that is, development of a licensed music distribution system. Any discrepancy between the parties' interpretation of general loan terms like "overhead costs," Bertelsmann argued, amounted at most to evidence of a contract dispute, not of a cover-up intended to defraud the courts. Finally, Bertelsmann maintained that even if it had

agreed to fund Napster's litigation expenses, this was not grounds for copyright infringement liability, and that Bertelsmann executives and lawyers would not have viewed it as such in 2000, when the loan was made. Therefore, Bertelsmann argued, appellees failed to prove either the materiality or intent elements of fraud on the court.

On April 20, 2006, the district court issued an order compelling Bertelsmann to disclose all attorney-client communications "related to the creation of the loan document and to the submission of that loan document in the bankruptcy proceedings and to this court." The district court held that appellees had made the "prima facie case" showing of the crime-fraud exception that is required in this circuit, characterizing this requirement as "quite lenient." The district court further concluded that, in determining whether the crime-fraud exception applied, it "need only consider the evidence offered by the moving party," and that it need not "consider conflicting evidence offered by the party seeking to uphold the privilege."

The district court specifically credited three pieces of direct evidence: Barry's October 25, 2000 email; Timm's October 27, 2000 memorandum; and Barry's September 28, 2005 deposition testimony. It also noted appellees' circumstantial evidence of Bertelsmann's interest in keeping Napster afloat, and of Bertelsmann's knowledge of Napster's use of loan proceeds for litigation expenses. According to the district court, this evidence established that "Bertelsmann executives and Bertelsmann's outside counsel . . . cooperated in documenting the investment in Napster in a manner contrary to the parties' actual understanding," and then "submitted the loan document, through its lawyers, both in the bankruptcy litigation and in the litigation before this court."

The district court stated that it would reach the same result even if it considered Bertelsmann's countervailing evidence. First, it noted that although Napster's activities had not yet

been held illegal on appeal when it was structuring the alleged loan, Bertelsmann did not have "no reason to be concerned about its liability." Because Bertelsmann submitted the loan note as evidence in the district court proceedings, and because the district court might have "somehow concluded based on the loan document that, as a matter of law, Bertelsmann had no financial stake in Napster[ ]," the district court concluded the "secret agreement" was material to the litigation. Finally, the district court accorded "some weight" to the deposition testimony of the two Wilson Sonsini attorneys, of Napster director Hummer, and of the Bertelsmann executives. But it found that the executives' corroboration of Bertelsmann's position was "unsurprising," and it held that the whole of Bertelsmann's countervailing evidence was insufficient to rebut appellees' showing.

Bertelsmann timely appeals from the district court's order (No. 06-15886), and, in the alternative, petitions for a writ of mandamus (No. 06-72515).

## II.   Appellate Jurisdiction

**[1]** Under 28 U.S.C. § 1291, courts of appeals have jurisdiction over all "final" district court decisions. However, we also have jurisdiction under § 1291 over a "narrow class of decisions that do not terminate the litigation, but must, in the interest of achieving a healthy legal system, nonetheless be treated as final." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (internal quotation marks and citation omitted). In order to be reviewable under the "collateral order doctrine," a decision must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) (bracketed numbers added).

The first and third prongs of the collateral order test, as articulated in *Coopers & Lybrand*, are easily satisfied in this

case. We have repeatedly held that where, as here, a district court holds, following full development of the issues by the parties, that a privilege has been vitiated, its order constitutes a conclusive determination. *See United States v. Griffin*, 440 F.3d 1138, 1141 (9th Cir. 2006) (holding order vitiating marital privilege is conclusive); *Agster v. Maricopa County*, 422 F.3d 836, 838 (9th Cir. 2005) (same, peer review privilege); *United States v. Austin*, 416 F.3d 1016, 1020 (9th Cir. 2005) (same, joint defense privilege); *see also Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003) (en banc) (reviewing scope of protective order concerning attorney-client communications in ineffective assistance of counsel habeas petition). We have also recognized that once privileged materials are ordered disclosed, the practical effect of the order is often "irreparable by any subsequent appeal." *Griffin*, 440 F.3d at 1142 (internal quotation marks omitted). This case is one of those in which "[o]nce '[t]he cat is already out of the bag,' it may not be possible to get back in." *Agster*, 422 F.3d at 838 (quoting *Bittaker*, 331 F.3d at 718) (first brackets added). Therefore, we hold that the district court's order requiring Bertelsmann to produce attorney-client communications represents a conclusive determination that is effectively unreviewable on appeal from final judgment.

**[2]** The only debatable issue is whether the second prong has been satisfied. The Capitol Records appellees concede that it has been. The Leiber appellees, however, disagree. They contend that the attorney-client privilege issue now on appeal is not sufficiently separate from the issues to be resolved in the underlying lawsuit against Bertelsmann. In support of this contention, the Leiber appellees point out that the application of the crime-fraud exception to the attorney-client privilege depends upon the characterization of Bertelsmann's "loan" to Napster, that the outcome of the underlying suit may depend on this characterization, and that the content of the attorney-client communications may be relevant to the characterization question. Despite the concession of the Capi-

tol Records appellees that the second prong has been satisfied, we regard it as a somewhat close question.

**[3]** The *Coopers & Lybrand* articulation of the collateral order doctrine is a gloss on the doctrine as originally articulated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). The Court wrote in *Cohen*, "This decision appears to fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, *too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.*" *Id.* at 546 (emphasis added). Where an interlocutory appeal concerns the protection of the attorney-client privilege, we have held that the second prong of the *Coopers & Lybrand* test is satisfied even where there is some potential overlap between questions in the interlocutory appeal and those involved in the underlying suit. That is, we have held in such cases that the second prong is satisfied because, in the words of *Cohen*, the "claim of right" is "too important to be denied review and too independent of the cause itself" to require that we wait until the underlying dispute is fully resolved.

For example, in *Bittaker v. Woodford* the underlying suit was a federal habeas petition brought by a prisoner under sentence of death. The prisoner sought to use attorney-client communications to show ineffective assistance of trial counsel, but he was afraid that if his habeas petition was successful the State would use these same attorney-client communications against him on retrial. *Bittaker*, 331 F.3d at 716. The federal district court entered a protective order prohibiting the State from using the attorney-client communications for any purpose other than the pending habeas litigation. *Id.* at 717. The State brought an interlocutory appeal, contending that by introducing his attorney-client communications in the district court the federal habeas petitioner had waived the attorney-client privilege for all purposes, including his possible criminal retrial. *Id.* We held that the second prong of *Coopers &*

*Lybrand* had been satisfied even though the content of the attorney-client communications was directly relevant to the underlying habeas proceeding and might well be relevant (if admissible) on retrial. *Id.* at 717-18; *see also Osband v. Woodford*, 290 F.3d 1036, 1040 (9th Cir. 2002) (allowing interlocutory appeal of district court protective order: "The many federal habeas petitioners who each year raise claims of ineffective assistance of counsel (and the concomitant issue of waiver of privilege) need to know the implications of making such claims, as does the petitioner in this case.").

**[4]** The issue in this interlocutory appeal is whether Bertelsmann's attorney-client privilege may be vitiated because Bertelsmann used, or intended to use, its counsel to commit a fraud on the courts. The issue in the underlying case is whether Bertelsmann is liable for copyright infringement by Napster and/or Napster's users. *See Griffin*, 440 F.3d at 1142. We conclude that the attorney-client privilege issue presented in this interlocutory appeal is "completely separate from the merits of the action" in the sense intended in *Coopers & Lybrand*. 437 U.S. at 468. That is, the issue is "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen*, 337 U.S. at 546.

**[5]** Because all three prongs of the collateral order test are satisfied, we hold that we have jurisdiction over Bertelsmann's interlocutory appeal from the district court's final production order. Because we have jurisdiction over Bertelsmann's appeal, we need not reach the questions presented by its petition for a writ of mandamus.

## III.   Standard of Review

Several of our sister circuits review district court orders vitiating attorney-client privilege under the crime-fraud exception for abuse of discretion rather than de novo. *See United States v. Laurins*, 857 F.2d 529, 541 (9th Cir. 1988);

*see also In re Grand Jury Proceedings*, 87 F.3d 377, 380 (9th Cir. 1996). However, we have held that "rulings on the scope of the privilege," including the crime-fraud exception, "involve mixed questions of law and fact and are reviewable *de novo*, unless the scope of the privilege is clear and the decision made by the district court is essentially factual; in that case only clear error justifies reversal." *Laurins*, 857 F.2d at 541 (citing *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987), *vacated in part on other grounds*, 842 F.2d 1135 (9th Cir. 1988)); *see also In re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 829 (9th Cir. 1994) (stating that in the crime-fraud context "[w]e review de novo 'whether an evidentiary showing is sufficient . . . .' ") (quoting *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992)).

## IV.   The Crime-Fraud Exception

The attorney-client privilege is the oldest and arguably most fundamental of the common law privileges recognized under Federal Rule of Evidence 501. *See United States v. Zolin*, 491 U.S. 554, 562 (1989). The assurance of confidentiality promotes open attorney-client communications, which are "central to the legal system and the adversary process." *United States v. Hodge & Zweig*, 548 F.2d 1347, 1355 (9th Cir. 1977); *see also Zolin*, 491 U.S. at 562. The attorney-client privilege protects fundamental liberty interests by allowing individuals to seek the legal advice they need "to guide them through [the] thickets" of complex laws. *United States v. Chen*, 99 F.3d 1495, 1499 (9th Cir. 1996).

**[6]** Notwithstanding its importance, the attorney-client privilege is not absolute. The "crime-fraud exception" to the privilege protects against abuse of the attorney-client relationship. *Hodge & Zweig*, 548 F.2d at 1355. As the Supreme Court wrote in *Clark v. United States*, 289 U.S. 1 (1933), "The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the

commission of a fraud will have no help from the law. He must let the truth be told." *Id.* at 15.

**[7]** A party seeking to vitiate the attorney-client privilege under the crime-fraud exception must satisfy a two-part test. First, the party must show that "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." *In re Grand Jury Proceedings*, 87 F.3d at 381 (internal quotation marks omitted). Second, it must demonstrate that the attorney-client communications for which production is sought are "sufficiently related to" and were made "*in furtherance of* [the] intended, or present, continuing illegality." *Id.* at 382-83 (internal quotation marks omitted) (emphasis added); *see also In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995).

The attorney need not have been aware that the client harbored an improper purpose. Because both the legal advice and the privilege are for the benefit of the client, it is the client's knowledge and intent that are relevant. *In re Grand Jury Proceedings*, 87 F.3d at 381-82; *see also Chen*, 99 F.3d at 1504. The planned crime or fraud need not have succeeded for the exception to apply. The client's abuse of the attorney-client relationship, not his or her successful criminal or fraudulent act, vitiates the privilege. *In re Grand Jury Proceedings*, 87 F.3d at 382.

In determining the proper procedures for deciding whether the crime-fraud exception applies, we bear in mind the importance of the attorney-client privilege and the potentially irreparable consequences of disclosure. *See Bittaker*, 331 F.3d at 718 (stating that invalid disclosure may create "serious prejudice" even at retrial). At the same time, however, we bear in mind that the party challenging the privilege may lack sufficient evidence to prove crime or fraud to a liability standard, particularly given the fact that the best evidence is likely to be in the hands of the party invoking the privilege. *See Zolin*,

491 U.S. at 569 (discussing challenges of proving crime-fraud).

Despite the fundamental importance and long history of the attorney-client privilege and the crime-fraud exception, the procedures for preserving the privilege against a crime-fraud challenge are surprisingly unclear. In *United States v. Zolin*, decided eighteen years ago, the Court explained the proper course for a district court addressing a crime-fraud challenge in deciding whether to review attorney-client communications *in camera* and whether, after *in camera* review, to order that the communications be disclosed. The Court in *Zolin* recognized that even after its explanation, important questions were left unanswered.

Among them were, first, what procedures are to be followed when an order to compel outright disclosure rather than *in camera* review is at stake? Second, what is the burden of proof on the party seeking to compel outright disclosure under the crime-fraud exception? As to the second question, the Court wrote in *Zolin*, with some understatement:

> We note . . . that this Court's use in *Clark v. United States*, [289 U.S. 1, 14 (1933),] . . . of the phrase "*prima facie* case" to describe the showing needed to defeat the privilege has caused some confusion. In using the phrase in *Clark*, the Court was aware of scholarly controversy concerning the role of the judge in the decision of such preliminary questions of fact. The quantum of proof needed to establish admissibility was then, and remains, subject to question. In light of the narrow question presented here for review, this case is not the proper occasion to visit these questions.

491 U.S. at 563 n.7 (internal citations omitted). Despite continuing confusion in the lower courts, the Court has not revis-

ited the crime-fraud exception to the attorney-client privilege since *Zolin*.

The district court tried conscientiously to follow applicable precedent, both of the Supreme Court and of this court. Given the lack of clarity of that precedent, we intend no criticism of the district court when we say that we disagree with its understanding of the applicable law. The two questions relevant to this appeal are subsets of the questions, noted above, that were left unanswered by *Zolin*. First, in a civil case, should the district court consider not only the evidence adduced by the party seeking to vitiate the attorney-client privilege by invoking the crime-fraud exception, but also the evidence adduced by the party seeking to preserve the privilege? Second, in a civil case, what is the burden of proof for the party seeking to establish the crime-fraud exception? We address these questions in turn.

### A.   Consideration of Evidence

We begin our analysis with *Zolin*, in which the Internal Revenue Service sought to vitiate the attorney-client privilege under the crime-fraud exception. The question in *Zolin* was whether a party seeking to establish that the crime-fraud exception applies must rely entirely on sources independent of the disputed attorney-client communications, or whether a district court "may *ever* honor" a request that it conduct *in camera* review of some of the communications to assist in the determination that the privilege has been vitiated. 491 U.S. at 560-61, 565 (emphasis in original). The Court first looked to Federal Rule of Evidence 104(a), which provides that " '[p]reliminary questions concerning . . . *the existence of a privilege* . . . shall be determined by the court . . . . In making its determination it is not bound by the rules of evidence *except those with respect to privileges*.' " *Zolin*, 491 U.S. at 565 (emphasis in *Zolin*).

[8] The Court held that Rule 104(a) did not bar *in camera* inspection of the attorney-client communications by the dis-

trict court. *Id.* at 568. It further held that because *in camera* review "does not have the legal effect of terminating the privilege," and is thus "a smaller intrusion" on the attorney-client privilege than outright disclosure, a "lesser evidentiary showing is needed to trigger *in camera* review" than would be necessary "ultimately to overcome the privilege." *Id.* at 568, 572 (internal quotation marks omitted). The Court concluded that the district court needs only to "require a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* at 572 (internal quotation marks and citation omitted). "Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Id.*

[9] There is nothing in *Zolin* specifically indicating whether the party seeking to preserve the attorney-client privilege has the right to present countervailing evidence before the district court decides whether to conduct an *in camera* review of the attorney-client communications. It has been assumed by a number of courts of appeal, including our own, that while nothing forbids the district court from asking for or receiving such countervailing evidence, there is also nothing requiring the district court to do so. *See, e.g.*, *In re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d at 829-30 (following *Haines v. Liggett Group Inc.*, 975 F.2d 81 (3d Cir. 1992)); *In re Gen. Motors Corp.*, 153 F.3d 714, 716 (8th Cir. 1998). But the procedural posture and consequences of an *in camera* inspection of the disputed communications are fundamentally different from those of an order requiring their outright disclosure. As the Third Circuit wrote in *Haines v. Liggett Group Inc.*, "*[I]n camera* examination of documents by the court . . . is a comparatively non-dispositive procedural way station." 975 F.2d at 96. By contrast, an order requiring outright disclosure to the adverse party "break[s] the seal of a highly protected privilege." *Id.* Accordingly, we explained in *In re Grand Jury Investigation* that the threshold for *in camera* review is "con-

siderably lower" than that "for fully disclosing documents." 974 F.2d at 1073. Neither the appellees nor the appellant in this case requested that the district court conduct *in camera* review of the disputed communications.

[10] We have never squarely ruled on the question whether a party in a civil case, seeking to preserve the attorney-client privilege against a crime-fraud challenge, has the right to present countervailing evidence when the district court is deciding whether to order outright disclosure. The case most closely on point is *United States v. Laurins*, where a criminal defendant argued that the district court had improperly held that the crime-fraud exception applied, and had therefore improperly admitted privileged attorney-client communications into evidence. 857 F.2d at 540. We wrote that "[t]he evidence presented by the government met [the] standard" for a *prima facie* case sufficient to justify vitiating the privilege. *Id.* at 541. While we noted that the district court had made its ruling "[f]ollowing a hearing," we did not discuss whether the district court had considered, or was required to consider, countervailing evidence produced by the non-moving party. *Id.* at 540; *see also Chen*, 99 F.3d at 1499 (noting that the district court vitiated privilege "[a]fter considering all the evidence," including that produced by the non-moving party). It appears to be an open question in this circuit whether in a civil case a party seeking to preserve the attorney-client privilege against a crime-fraud challenge has the right to introduce countervailing evidence when the question is not whether to order *in camera* review but rather whether to order outright disclosure.

[11] We hold that in civil cases where outright disclosure is requested the party seeking to preserve the privilege has the right to introduce countervailing evidence. In so holding, we agree with the well-reasoned decision of Judge Aldisert for the Third Circuit in *Haines*. That court wrote:

> Deciding whether the crime-fraud exception applies
> is another matter [from deciding whether to conduct

*in camera* review]. If the party seeking to apply the exception has made its initial showing, then a more formal procedure is required than that entitling plaintiff to *in camera* review. The importance of the privilege, as we have discussed, as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege.

*Haines*, 975 F.2d at 96-97; *see also In re Gen. Motors Corp.*, 153 F.3d at 716; *In re Feldberg*, 862 F.2d 622, 625-26 (7th Cir. 1988). We are not convinced that in all cases it is necessary for the district court to conduct a live hearing with oral argument; in appropriate cases, the court may decide the matter on the papers. But we are convinced, as was the court in *Haines*, that in a civil case the party resisting an order to disclose materials allegedly protected by the attorney-client privilege must be given the opportunity to present evidence and argument in support of its claim of privilege. *See also Laser Indus., Ltd. v. Reliant Techs., Inc.*, 167 F.R.D. 417, 427-28 (N.D. Cal. 1996) (discussing and relying on *Haines*).

## B.   Burden of Proof

The Court in *Zolin* adhered to the cryptic statement made more than fifty years earlier in *Clark* that the burden of proof on the party seeking to vitiate a privilege was to make "a showing of a prima facie case sufficient to satisfy the judge that the light should be let in." *Clark*, 289 U.S. at 14. Although the Court specified the burden of proof for cases in which *in camera* review is at issue, and although it stated that "a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege," *Zolin*, 491 U.S. at 572, the Court specifically declined to clarify the meaning of a "*prima facie* case" where outright disclosure is sought and to specify the burden of proof applicable to such cases. *Id.* at 563 n.7.

**[12]** Both before and after *Zolin,* the lower courts have struggled with the meaning of "*prima facie* case" in cases in which outright disclosure of attorney-client communications has been sought. In cases in which disclosure of communications to a grand jury has been at issue, the courts of appeals have devised various standards, including "probable cause to believe," *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (internal quotation marks omitted); "some foundation in fact," *In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998); "reasonable basis," *In re Grand Jury Proceedings*, 417 F.3d 18, 23 (1st Cir. 2005); "evidence such as will suffice until contradicted and overcome by other evidence," *In re Grand Jury Subpoena*, 419 F.3d 329, 336 (5th Cir. 2005) (internal quotation marks omitted); and "evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met," *In re Grand Jury Investigation*, 445 F.3d 266, 274 (3d Cir. 2006) (internal quotation marks omitted). These standards, and the differences between them, are not entirely free from confusion. *See, e.g.*, *In re Sealed Case*, 107 F.3d 46, 49-50 (D.C. Cir. 1997).

The standard in our circuit for grand jury cases is " 'reasonable cause to believe' that the attorney's services were 'utilized . . . in furtherance of the ongoing unlawful scheme.' " *In re Grand Jury Proceedings*, 87 F.3d at 381 (quoting *In re Grand Jury Proceedings (John Doe)*, 867 F.2d 539, 541 (9th Cir. 1989) (ellipsis in original)). We have explained our "reasonable cause to believe" standard as follows: "Reasonable cause is more than suspicion but less than a preponderance of evidence." *Chen*, 99 F.3d at 1503 (explicating *In re Grand Jury Proceedings*, 87 F.3d at 381, which stated the standard as less than "beyond a reasonable doubt" but more than "a sneaking suspicion").

In *Laser Industries, Ltd. v. Reliant Technologies, Inc.*, Judge Brazil concluded, after a thorough and thoughtful discussion, that not only the procedures involving presentation of

evidence, but also the burden-of-proof standard, may appropriately be different in civil and grand jury cases. 167 F.R.D. at 426-27. Other courts of appeal have noted that "the need for speed and simplicity at the grand jury stage" weighs against a crime-fraud standard that requires courts to "hear testimony or to determine facts from conflicting evidence" before making a crime-fraud determination. *In re Sealed Case*, 676 F.2d 793, 815 n.88 (D.C. Cir. 1982); *see also In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987) ("If courts always had to hear testimony and conflicting evidence . . . , the rationale behind the prima facie standard — the promotion of speed and simplicity at the grand jury stage — would be lost."); *In re Antitrust Grand Jury*, 805 F.2d 155, 167 (6th Cir. 1986). The Third Circuit, which requires that both parties be heard in civil but not in grand jury cases, has explained that "the rules of the game are different" in grand jury proceedings because of the particular "importance of secrecy" and of speedy resolution, which might be impeded by adversarial hearings on privilege. *In re Grand Jury Subpoena*, 223 F.3d 213, 218 (3d Cir. 2000). We express no opinion about whether a district court may consider only the evidence of the moving party in deciding whether to allow presentation of attorney-client communications to a grand jury. *See Haines*, 975 F.2d at 97 n.8; *Laser Indus.*, 167 F.R.D. at 426-27. But we agree with the statement in *Laser Industries* that, with respect to burden of proof, "different standards may well be appropriate." *Id.* at 438.

**[13]** We have never squarely addressed the question whether our "reasonable cause to believe" standard, applicable in grand jury cases, is also applicable in civil cases. In *Laurins*, a criminal appeal rather than a grand jury case, we wrote without elaboration: "All the government needed to show was evidence that if believed by the jury would establish the elements of an ongoing violation." 857 F.2d at 541. In *United States v. Chen*, a grand jury case, we cited this language from *Laurins,* but only after quoting and discussing our established "reasonable cause to believe" standard applicable

in grand jury cases. 99 F.3d at 1503. The "evidence that if believed" language of *Laurins* can be read to mean evidence giving "reasonable cause to believe," but the two phrases are not necessarily synonymous. Moreover, even if the phrases are synonymous (which we tend to think they are not), neither *Laurins* nor *Chen* was a civil case.

**[14]** For several reasons, we conclude that in a civil case the burden of proof that must be carried by a party seeking outright disclosure of attorney-client communications under the crime-fraud exception should be preponderance of the evidence.

First, requiring a moving party to establish the existence of the crime-fraud exception by a preponderance of the evidence is consonant with the importance of the attorney-client privilege. As we recognized in *United States v. Hodge & Zweig*, this privilege is "central to the legal system and the adversary process" and thus deserving of "unique protection in the courts." 548 F.2d at 1355. It would be very odd if in an ordinary civil case a court could find such an important privilege vitiated where an exception to the privilege has not been established by a preponderance of the evidence. *See United States v. Mett*, 178 F.3d 1058, 1065 (9th Cir. 1999) ("[W]here attorney-client privilege is concerned, hard cases should be resolved in favor of the privilege, not in favor of disclosure . . . . '[A]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.' " (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)).

Second, the phrase "*prima facie* case," used by the Court in *Clark* and then fifty years later in *Zolin*, is not inconsistent with a preponderance of the evidence standard. "*Prima facie* case" is "among the most rubbery of all legal phrases." *In re Grand Jury Proceedings*, 417 F.3d at 22. As it relates to the crime-fraud exception, "[t]he prima facie standard has always been poorly defined, inconsistently interpreted and generally

misunderstood." Paul R. Rice, *Attorney-Client Privilege in the United States* § 8.6, at 44 (2d ed. 1999). In *Clark* itself, the "*prima facie* case" standard was not used to decide a question of attorney-client privilege. Rather, it was used to decide whether inquiry could be made into the actual facts of jury deliberations despite the "privilege which protects from impertinent exposure the arguments and ballots of a juror while considering his verdict." 289 U.S. at 13-14. It is not at all clear what the Court in *Clark* would have said if the attorney-client privilege had been at stake rather than the privilege of jury privacy.

Third, as interpreted by the Supreme Court, Federal Rule of Evidence 104(a), which governs preliminary questions of fact concerning privileges, requires a preponderance of the evidence standard. Although the Court, in *Clark*, recognized the existence of a jury privilege as a "preliminary question[ ]," the Federal Rules of Evidence had not been promulgated when that case was decided. 289 U.S. at 14 n.1. Federal Rule of Evidence 104(a) now provides that "[p]reliminary questions concerning the . . . existence of a privilege . . . shall be determined by the court . . . . In making its determination it is not bound by the rules of evidence except those with respect to privileges." In *Bourjaily v. United States*, 483 U.S. 171 (1987), a case involving the admissibility of an alleged co-conspirator's statement, the Supreme Court held that "preliminary factual questions" under Rule 104(a) must be "established by a preponderance of proof." *Id.* at 175; *see also id.* at 176 ("preponderance of the evidence"). In *Zolin*, the Court discussed the "except . . . with respect to privileges" clause of Rule 104(a) at length, but did not reach the question of the burden of proof applicable to a decision to order outright disclosure of attorney-client communications. 491 U.S. at 565-68. *Zolin* is therefore not directly on point, but we believe that it signals that preliminary questions concerning the existence or non-existence of the attorney-client privilege — including whether the crime-fraud exception "terminate[s] the privilege," *id.* at 568 — must be established under Rule 104(a).

And we know from *Bourjaily* that preliminary questions of fact under Rule 104(a) must be established by a preponderance of the evidence.

Finally, the problem of limited access to proof by the party seeking to vitiate the attorney-client privilege is mitigated by the possibility of *in camera* review of the communications by the district court under the far less demanding standard of *Zolin*. We do not regard *in camera* review as a panacea, for a "blanket rule allowing *in camera* review . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk"; raise "possible due process implications"; and place significant burdens upon the district courts "without open adversarial guidance by the parties." *Zolin*, 491 U.S. at 571. For these reasons, the Court, in *Zolin*, was very careful to leave the decision whether to conduct an *in camera* review within "the sound discretion of the district court." *Id.* at 572. But judicious use of *in camera* review, combined with a preponderance burden for terminating privilege, strikes a better balance between the importance of the attorney-client privilege and deterrence of its abuse than a low threshold for outright disclosure.

## V.   Merits

**[15]** Even though it thought it was not required to do so, the district court did consider the countervailing evidence presented by Bertelsmann in support of the attorney-client privilege. But the district court did not apply the preponderance of the evidence standard that we today hold is applicable to a civil case in which outright disclosure of attorney-client communications is sought under the crime-fraud exception. Looking at the evidence presented in this case under the preponderance standard, we hold that even if all of the evidence proffered by appellees is believed, there is an insufficient basis to hold that the attorney-client privilege may be vitiated under the crime-fraud exception.

Appellees contend that there has been "fraudulent deceit" under California Civil Code §§ 1709 and 1710. Such fraud comprises five elements: "(a) misrepresentation . . . ; (b) knowledge of falsity (or scienter); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (internal quotation marks omitted). But appellees do not merely allege garden variety fraud. They allege fraud on the court. Fraud on the court "embrace[s] only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court." *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 780 (9th Cir. 2003) (quoting *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999)). A party's failure to disclose information, or even a party's perjury, does not ordinarily constitute fraud on the court. *Id.*

[16] As discussed above, appellees rely on two theories of fraud on the court. The first is that the entire loan was a sham intended for use in future legal proceedings as a means of disguising Bertelsmann's purchase of control of Napster. The strongest evidence that appellees have that Bertelsmann sought to purchase an equity stake in Napster is the right of Bertelsmann to convert the loan to equity once the licensed music distribution system was launched. But that right, given by the express terms of the loan documents, could hardly have been fraudulently procured, given that it was stated expressly. Nor does it tend to prove that the entire loan was a sham. The only other evidence appellees have offered in support of this theory are documents showing that Bertelsmann's counsel and executives attempted to structure its deal with Napster to limit its potential liability. These documents do not prove fraud. If a party could establish the crime-fraud exception simply by showing that an opponent structured a business transaction to limit its liability, the attorney-client privilege would be worth little, for under this standard many commercial disputes could be recast as fraud on the court. Such a standard would defeat a primary purpose of the attorney-client

privilege, which is to encourage individuals to seek legal counsel "to guide them through [the] thickets" of complex laws. *Chen*, 99 F.3d at 1499.

[17] Appellees' second theory is that Bertelsmann undertook a scheme to defraud the courts by hiding a side agreement that allowed Napster to use a portion of the loan proceeds to pay its litigation expenses. Even if we credit the Barry email, the Timm memorandum, and the Barry deposition testimony relied on by the district court, and even if we conclude that Bertelsmann agreed with Napster that the term "overhead costs" in the loan documents would include litigation expenses, we would not conclude that this evidence establishes an intentional, material misrepresentation directly "aimed at the court." *Appling*, 340 F.3d at 780.

First, according to appellees' evidence, both Barry and Timm characterized the side agreement about litigation expenses as a refinement rather than misrepresentation of the terms of the loan documents. At his deposition, Barry explained that he believed that "we had an agreement that GNA and overhead included litigation expenses." When asked if the loan documents were "false" because they stated that the loan proceeds could be used solely for the new model and associated overhead costs, Barry answered "No." Timm's memorandum also treated litigation expenses as a subset of the "general, administrative and overhead expenses" clause in the loan documents.

[18] Bertelsmann's evidence only reinforces our conclusion that the loan terms did not constitute a fraudulent misrepresentation. At her deposition, Timm testified that she considered "overhead" to be a broad "word that would give my client more freedom on how to spend [the] money." Timm stated that she did not view the alleged verbal agreement about litigation expenses as "inconsistent with the express terms that were being used in the transaction documents." Timm's supervisor, Bochner, testified at his deposition that

"the terminology 'working capital and overhead expenses' — are not precise. So I don't think it is odd for the parties to further refine what they mean by terms like that, in a legally-binding way; in a non-legally binding way. And this appears to be a conversation that was had." Taken either alone or along with Bertelsmann's evidence, appellees' evidence does not establish that the loan terms constituted a fraud. Rather, the evidence shows routine wrangling over contract terms and a lawyerly attempt to make inconspicuous the fact that some of the money could be used for litigation expenses. *Cf. Laurins*, 857 F.2d at 534, 536, 540-41 (evidence directly established that, after receiving IRS summons, Laurins instructed his employee to box up summoned records and then removed them; his lawyer told the IRS Laurins did not have the records; and the FBI seized the records from Laurins' house).

Second, even if we were to conclude that the written terms of the loan misrepresented the parties' agreement to allow some of the funds to be used for litigation expenses, appellees' evidence nowhere suggests that Bertelsmann selected these terms with the intent to defraud the courts. *Cf. Chen*, 99 F.3d at 1497-98 (privilege holder's sister and former employee gave affidavit stating he directed her to take steps to help him defraud the government). The fact that a party has taken steps to structure a business transaction to limit its liability does not suffice, without more, to establish that the crime-fraud exception applies. *See In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 643-44 (8th Cir. 2001). Further, there is little or no indication that in 2000 Bertelsmann anticipated that liability might attach based merely on its funding of some of Napster's litigation expenses. When asked at his deposition why Bertelsmann did not want an express side agreement about litigation expenses, Barry stated that he assumed Bertelsmann was trying to appease its music subsidiary BMG, which was then suing Napster. Barry explained, "Bertelsmann, knowing that they were going to continue, that the litigation would continue with BMG as a plaintiff, didn't

want . . . BMG and Bertelsmann didn't want the fact of our using that money for litigation purposes to be public."

In evidence submitted by appellees, former BMG Vice President Kevin Conroy confirmed in his deposition that there had been tension between Bertelsmann and its subsidiary BMG as a result of its loan to Napster. Conroy acknowledged that BMG, Bertelsmann's subsidiary, worried that "[w]e will be perceived as having betrayed the entire music industry, recording and publishing, as well as other copyright organizations due to the precedential nature of this lawsuit." On the evidence before us, we cannot credit the view that Bertelsmann structured its agreement with Napster with a view to deceive the courts in suits that had not been filed and to avoid liability based on legal theories not yet advanced, rather than to serve its more immediate goals with respect to its subsidiary BMG.

Third, even assuming, *arguendo*, that Bertelsmann's failure to spell out in the loan documents that "overhead costs" included litigation expenses was an intentional misrepresentation, we do not see how it could have deceived a court into concluding that Bertelsmann provided no financial support to, or had no financial stake in, the existing Napster company. *See UMG Recordings*, 222 F.R.D. at 414. Although the loan documents did not clarify what were "overhead costs associated with" "the development of a new model for Company's services," the Umbrella Agreement expressly defined the "New System" that was being financed as "the version of the [existing] Napster System that achieves Acceptance" from the music industry. The new model was being developed within the existing Napster, a small start-up company, apparently using the same facilities, employees, servers, and software as the existing, allegedly infringing model. As Conroy testified at his deposition, it was not "a binary thing, . . . it was all one entity." If funding Napster's litigation may have helped to prolong Napster's existence, so, too, did injecting any cash into Napster. Any "financial stake" that Bertelsmann had in

Napster and in "the outcome of [its] litigation against the record labels" was inherent in the loan itself, regardless of whether "overhead costs" included litigation expenses or simply rent, salary, servers, and software. As Barry bluntly put it in his deposition testimony, "If there is no company, there is no new model."

## Conclusion

**[19]** For the foregoing reasons, in a civil case in which outright disclosure of attorney-client communications is sought under the crime-fraud exception, we hold that (1) both parties have a right to present evidence to the district court, and (2) the party seeking disclosure must prove by a preponderance of the evidence that the exception applies. We further hold that on the facts of this case the crime-fraud exception has not been established. We therefore reverse the order of the district court requiring the disclosure of the attorney-client communications at issue. We remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.